IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RAYMOND D. MASSENBURG,

    Plaintiff,

v.                                                  Civil Action No. 3:08cv106

VANESSA P. ADAMS, *et al.*,

    Defendants.

## MEMORANDUM OPINION

Raymond D. Massenburg, a former federal inmate proceeding *pro se* and *in forma pauperis*, brings this *Bivens*[1] action. Massenburg's complaint arises out of his incarceration at the Federal Prison Camp in Petersburg, Virginia, which is part of a Federal Correctional Complex ("FCC Petersburg"). Massenburg claims that Defendants[2] violated the First Amendment by denying Massenburg his right to rest on the Sabbath. Defendants filed motions for summary judgment (Docket Nos. 77, 78, 79), providing Massenburg with appropriate *Roseboro*[3] notice (Docket Nos. 81, 82, 83). Massenburg did not respond. The matter is ripe for disposition.

---

[1] *Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[2] Massenburg named as defendants Vanessa P. Adams, former Warden at FCC Petersburg; Laurene G. Sharpe, former Executive Assistant/Camp Administrator at FCC Petersburg; and Larry Moody, former Unit Manager at FCC Petersburg.

[3] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

## I. SUMMARY OF ALLEGATION

On February 7, 2008,[4] Massenburg filed this lawsuit. Massenburg claims that Defendants violated his right to exercise his religious beliefs because Massenburg, who is a Hebrew Israelite, was required to work on July 22, 2006, the Sabbath of his religion. Massenburg requests compensatory damages of $1,095,000 per defendant, and punitive damages of $1,000,000 per defendant.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting* Fed. R. Civ. P. 56(c) and 56(e) (1986)). When reviewing a summary judgment motion, a court "must draw all justifiable inferences in favor of the nonmoving party." *United States v.*

---

[4] Pursuant to *Houston v. Lack*, 487 U.S. 266 (1988), an inmate's motion is deemed filed on the date it is handed to prison staff for mailing.

*Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Defendants have provided a declaration from Defendant Larry Moody, a declaration from Massenburg's Correctional Counselor Margarita Plumey, a declaration from Defendant Vanessa P. Adams, a declaration of FCC Petersburg Chaplain Jesus-Manuel Huertas, a declaration of Massenburg's job foreman, a declaration from Defendant Laurene Sharpe, a transcript from Massenburg's deposition, and a host of documentary evidence. All of the declarations are sworn to under penalty of perjury.

Massenburg, however, has produced no competent evidence. Massenburg's complaint is not sworn.[5] By Memorandum Opinion and Order filed on March 31, 2010, the Court informed Massenburg that because he filed an unsworn complaint, the allegations therein could not be considered as evidence. Previously, Massenburg filed two motions for summary judgment, neither of which were sworn. (Docket Nos. 50, 62.) The Court denied those motions for summary judgment without prejudice because of his failure to produce competent evidence. At that time, the Court informed Massenburg that although he had produced copies of grievance records, the Court would not consider them because Massenburg failed to authenticate them. *See Maidstone on Potomac, LLC v. CSX Transp., Inc.*, No. 3:08-CV-155, 2009 WL 2168205, at *3 (N.D. W. Va. July 21, 2009) ("When a party seeks to offer evidence through [exhibits other than depositions, answers to interrogatories, admissions, or affidavits], they must be identified by affidavit or otherwise made admissible in evidence." (*quoting Martz v. Union Labor Life Ins.*

---

[5] Although Massenburg attached an affidavit to his unsworn complaint, the affidavit is not signed. (Compl., Aff. Supp. of Compl. 3.)

*Co.*, 757 F.2d 135, 138 (7th Cir. 1985))); *Rogers v. Ford Motor Co.*, 952 F. Supp. 606, 610-11 (N.D. Ind. 1997) (granting motion to strike exhibits in the plaintiff's response to motion for summary judgment where attachments were not authenticated and therefore inadmissible).

Massenburg failed to cure these deficiencies. When Defendants filed their motions for summary judgment (Docket Nos. 77, 78, 79), Defendants provided Massenburg with the appropriate *Roseboro* notice. Specifically, each Defendant warned Massenburg that: (1) Massenburg was entitled to file a response to the motions for summary judgment; (2) the Court could dismiss the action on the basis of the Defendants' pleadings if Massenburg did not file a response; and, (3) Massenburg must identify all facts in dispute by offering a sworn affidavit or declaration. Nevertheless, after Defendants filed their motions for summary judgment and Massenburg was released from prison, Massenburg declined to file a responsive pleading.[6]

When a plaintiff "fail[s] to file counter-affidavits or other responsive material [after being] alerted to the fact that his failure to so respond might result in the entry of summary judgment against him," it may be proper to proceed with summary judgment. *Roseboro*, 528 F.2d at 310. Accordingly, the Court will treat the Defendants' motions as unopposed, while recognizing that a motion "will not be granted automatically simply because [it is unopposed]." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1190 (3d ed. West 2010). Massenburg's failure to respond to the summary judgment motions "'does not fulfill the

---

[6] The Court informed Massenburg that he neglected to file a response. (Dec. 16, 2010 Mem. Order 1.) The Court indicated to Massenburg that this suggested his lack of interest in further prosecuting the case. (*Id.*) Nevertheless, Massenburg did not file a responsive pleading to the Defendants' motions for summary judgment.

4

burdens imposed on moving parties by Rule 56,' and the movant[s] must demonstrate that [they are] entitled to judgment as a matter of law." *Consumers Union of U.S., Inc. v. Consumerreport.com*, No. 1:10cv268 (LMB/TCB), 2010 WL 5186405, at *2 (E.D. Va. Dec. 6, 2010) (*quoting Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993)).

### III. SUMMARY OF UNDISPUTED FACTS

The undisputed facts in accordance with Local Civil Rule 56(B) are as follows.[7] On July 14, 2006, prison staff changed Massenburg's job detail at FCC Petersburg to "Outside Safety and Sanitation" upon Massenburg's request. (Br. Supp. Mot. Summ. J. Ex. 4 ("Massenburg Dep."), at 15; Massenburg Dep. Ex. 2, 4; Br. Supp. Mot. Summ. J. Ex. 1 ("Moody Decl.") ¶ 6.) Shortly thereafter, the supervisor of Outside Safety and Sanitation, William Puryear, contacted Unit Manager Moody. (Moody Decl. ¶ 6.) Puryear informed Moody that Puryear's staff was at full capacity and indicated that Massenburg was performing the duties unsatisfactorily. (Moody Decl. ¶ 6.) Accordingly, on July 18, 2006, Moody removed Massenburg from Outside Safety and Sanitation and switched him to the relief shift[8] at the power plant. (Moody Decl. ¶ 6.)

---

[7] Local Civil Rule 56(B) provides that "the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such fact is controverted in the statement of genuine issues filed in opposition to the motion" in determining a motion for summary judgment. E.D. Va. Loc. Civ. R. 56(B). Massenburg did not oppose Defendants' motions for summary judgment. *See Martinez v. Resource Bank, FSB*, No. 1:09cv1112 (JCC/TCB), 2010 WL 1375232, at *2 n.3 (E.D. Va. Apr. 1, 2010); Fed. R. Civ. P. 56(e) & cmt. (West 2011). The 2010 amendments to the Federal Rules of Civil Procedure apply to this case. *See Sinclair v. Mobile 360, Inc.*, Nos. 09-1188, 09-1189, 2011 WL 733180, at *4 (4th Cir. Mar. 3, 2011).

[8] The relief shift was as follows: Mondays and Tuesdays from 3:30 p.m. until 11:00 p.m., Thursdays and Fridays from 11 p.m. until 6:00 a.m., and Sundays from 7:00 a.m. until 3:00 p.m. (Br. Supp. Mot. Summ. J. Ex. 6 ("Scott Decl.") ¶ 2.)

Sometime thereafter, Massenburg approached Moody and told him that the relief shift interfered with Massenburg's religion. (Moody Decl. ¶ 8.) Although Moody does not recall the name of Massenburg's religion, he does recall that he had never heard of the religion before. (Moody Decl. ¶ 8.) Moody requested that Massenburg submit a request in writing to Religious Services and resolve the matter with Camp Counselor Margarita Plumey. (Moody Decl. ¶ 8.)

Around the same time, Massenburg approached Moody and one of the chaplains at mealtime about Massenburg's insistence that Massenburg's work assignment conflicted with his religion. (Moody Decl. ¶ 9.) The chaplain stated that he would research Massenburg's request and report back to either Moody or Counselor Plumey.[9] (Moody Decl. ¶ 9.)

On August 7, 2006, Massenburg submitted an Informal Remedy Request to Moody. (Moody Decl. ¶ 10; Moody Decl. Ex. B.) That document indicates that Massenburg requested that his work assignment be changed so that he would "be able to have Friday & Saturday off." (Moody Decl. Ex. B.) Moody asked Massenburg to submit his request to Religious Services so that his Unit Team could verify the legitimacy of his request. (Moody Decl. ¶ 10.) Nevertheless, Moody moved Massenburg to the evening shift because the morning shift was filled to capacity.[10] (Moody Decl. ¶ 10.) Moody swears that at that time, Moody "did not have a clear understanding of Mr. Massenburg's religion or what his needs were, but [Moody] hoped the new schedule would solve the issue." (Moody Decl. ¶ 10.)

---

[9] Plumey swears that she has no recollection of Massenburg advising her of this conflict. (Br. Supp. Mot. Summ. J. Ex. 2 ("Plumey Decl.") ¶ 5.)

[10] Moody did not consider it necessary to make the shift change, but rather Moody made the change because there was an opening in the evening shift. (Moody Decl. ¶ 10.)

On August 16, 2006, Massenburg filed a formal complaint with the Warden's office. (Moody Decl. ¶ 11; Br. Supp. Mot. Summ. J. Ex. 3 ("Adams Decl.") ¶ 9.) In that formal complaint, Massenburg alleged that he had submitted an informal request to the chaplain. (Moody Decl. ¶ 11.) Moody investigated and determined that Religious Services never received an informal request. (Moody Decl. ¶ 11.) Nevertheless, Religious Services verified to Moody that Moody should accommodate Massenburg's request. (Moody Decl. ¶ 11.) At that time, Moody switched Massenburg to the morning shift at the power plant as he had requested. (Moody Decl. ¶ 11.)

## IV. ANALYSIS

### A. Liability of Supervisors Adams and Sharpe

Defendants Adams and Sharpe contend that they are not liable because they did not have any personal involvement with the decision to schedule Massenburg to work on his Sabbath. "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).[11] "The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* Thus, in *Iqbal*, where the claim involved "invidious discrimination in contravention of the First and Fifth Amendments . . . the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* (citing cases). Here, Massenburg alleges that Defendants violated his right to the

---

[11] The Supreme Court has "not found [in a *Bivens* action] an implied damages remedy under the Free Exercise Clause." *Iqbal*, 129 S. Ct. at 1948. The Court, however, has assumed, without deciding, that First Amendment claims are actionable under *Bivens*. *See id.*

7

free exercise of his religion under the First Amendment.¹² Thus, to state a claim, Massenburg must demonstrate that Defendants violated the Free Exercise Clause by imposing a substantial burden on the practice of his religion. *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006); *Couch v. Jabe*, 479 F. Supp. 2d 569, 584 (W.D. Va. 2006).

Government officials impose a substantial burden on the free exercise of religion by "'put[ting] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace*, 472 F.3d at 187 (*quoting Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). Additionally, Massenburg must demonstrate that each defendant's actions amount to a "conscious or intentional interference with [the plaintiff's] free exercise rights." *Id.* at 201; *see also T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (concluding that, after *Iqbal*, a supervisor in a *Bivens* action is not liable for the actions of a subordinate unless both share the requisite mental state); *Argueta v. U.S. Immigration & Customs Enforcement*, No. 2:08cv01652, 2010 WL 398839, at *7 (D.N.J. Jan. 27, 2010) (citing cases and discussing impact of *Iqbal* when someone other than a person at the "'highest level of the federal law enforcement hierarchy'" is sued (*quoting Iqbal*, 129 S. Ct. at 1943)).

The undisputed facts, set forth above, do not indicate that Defendants Adams and Sharpe had any personal involvement in Massenburg's conflict, nor engaged in any action which amounts to an intentional interference with Massenburg's free exercise rights. *See Lovelace*, 472

---

¹² "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

F.3d at 201. Neither scheduled Massenburg's job assignment, and neither were responsible for responding to Massenburg's complaints.

Defendant Sharpe, the Executive Assistant/Camp Administrator of FCC Petersburg, swears that "Massenburg never raised [the] complaint directly with [her] and never brought his concerns to [her] attention." (Br. Supp. Mot. Summ. J. Ex. 9 ("Sharpe Decl.") ¶ 9.) Sharpe "was unaware of the alleged Sabbath day violations until after the issue had been resolved." (Sharpe Decl. ¶ 9.)

On Sunday, August 20, 2006, Defendant Adams, then-Warden at FCC Petersburg, "learned for the first time [by way of a formal grievance] of Plaintiff's complaints regarding the alleged violation of his Sabbath day." (Adams Decl. ¶ 10.) Because the conflict was resolved on Wednesday, August 23, 2006, Adams responded to Massenburg's grievance and denied his request for a remedy. Based on these undisputed facts, Adams and Sharpe did not engage in any conscious or intentional interference with Massenburg's First Amendment Rights.[13]

### B. Liability of Defendant Moody

Moody switched Massenburg to the power plant relief shift because it was the work detail in need of an additional worker. (Moody Decl. ¶ 6.) When Massenburg complained to Moody about the religious conflict, Moody requested that Massenburg submit his request in writing to Religious Services. (Moody Decl. ¶ 8.) Moody had never heard of the Messianic/Sabbatarian classification or the Hebrew Israelite religion. (Moody Decl. ¶¶ 14, 15.)

---

[13] Although Warden Adams did not issue the regulation in question, see Lovelace, 472 F.3d at 200, the Court nevertheless analyzes whether the regulation which the prison enforced, 28 C.F.R. § 548.17, violated the First Amendment. See Part IV.C., infra.

The Code of Federal Regulations dictates how a federal inmate facing a religious conflict must request a job assignment change. The relevant regulation states:

> When the religious tenets of an inmate's faith are violated or jeopardized by a particular work assignment, a different work assignment ordinarily shall be made after it is requested in writing by the inmate, and the specific religious tenets have been verified by the chaplain. Maintaining security, safety, and good order in the institution are grounds for denial of such request for a different work assignment.

28 C.F.R. § 548.17.

Moody requested that Massenburg follow this procedure. Massenburg declined to follow the policy of the Bureau of Prisons—and Moody's instruction—by neglecting to verify with Religious Services that a shift change was necessary. Hoping to resolve the conflict, however, Moody moved Massenburg from the relief shift to the evening shift. (Moody Decl. ¶ 10.) When Massenburg again complained, Moody contacted the Chaplain, who had not received any informal, written request from Massenburg. The chaplain and Moody resolved the conflict by moving Massenburg to the morning shift. The undisputed facts make clear that Moody never intentionally or consciously violated Massenburg's First Amendment rights.

### C. First Amendment Analysis

Despite the Court's determination that the Defendants did not act with the requisite mental state for a constitutional cause of action, the Court will also address the policy the Defendants followed to determine "whether the policy by its own terms violates the Free Exercise Clause." *Lovelace*, 472 F.3d at 200 (requiring the district court to analyze the challenged policy even after finding that defendants did not act with the requisite intent).

"'Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.'" *Id.* at 199 (*quoting Turner v. Safley*, 482 U.S. 78, 84 (1987)). Nevertheless,

10

"[i]nmates' constitutional rights must be evaluated within the context of their incarceration." *Id.* Because "courts are ill equipped to deal with the increasingly urgent problems of prison administration" and because the administration of prisons is "peculiarly within the province of the legislative and executive branches of government," courts must defer to prison officials who oversee its many security, discipline, and administrative functions. *Id.* (citations and internal quotation marks omitted). For this reason, the test to determine whether a prison policy violated an inmate's right to free exercise of religion is one of reasonableness. *Id.* (*citing O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)). A prison regulation is "'valid if it is reasonably related to legitimate penological interests.'" *Id.* (*quoting Turner*, 482 U.S. at 89).

The Supreme Court of the United States instructs the courts to employ a four-factor test to determine whether a regulation is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89–92. Thus, the Court must determine (1) "whether there is a valid, rational connection between the prison regulation or action" and the asserted government interest; (2) whether Massenburg was "deprived of all forms of religious exercise" or whether he was "able to participate in other observances of [his] faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any obvious, easy alternatives to the challenged regulation or action." *Lovelace*, 472 F.3d at 200 (*quoting Turner*, 482 U.S. at 89–92) (internal quotations omitted). The prison's regulation and action in question pass muster under the *Turner* test.

Prison staff required Massenburg to request from the chaplain, in writing, verification that his work assignment conflicted with his religion. *See* 28 C.F.R. 548.17. Regarding the first factor, it is uncontradicted that this procedure "ensures that inmates are not allowed to refuse

work assignments at their discretion and that they instead demonstrate a legitimate basis for doing so." (Moody Decl. ¶ 7.) Otherwise, "the inmate work program simply would not operate efficiently."[14] (Moody Decl. ¶ 7.) Therefore, a valid, rational connection between the prison regulation or action and the asserted government interest exists.

Concerning the second factor, Massenburg was not deprived of all forms of religious exercise. The prison regulation requires only that prisoners obtain verification from the chaplain when they seek to change job assignments on account of their religion. *See* 28 C.F.R. § 548.17. Although Massenburg may have worked on his Sabbath, his ability to pray, study, and otherwise worship were not infringed. Indeed, if Massenburg had followed the prison regulation and obtained verification from the chaplain originally, he would not have worked on the Sabbath at all.

Analyzing the third factor, the desired accommodation—presumably allowing all inmates to invoke religion verbally instead of obtaining verification from the chaplain—would have a significant impact on the prison. If this were the case, "the inmate work program simply would not operate efficiently." (Moody Decl. ¶ 7.) Certainly, the expressed need for some independent religious review of work-change requests relates reasonably to the legitimate penological interest of maintaining records of orderly and consistent work assignments across the prison population.

As to the final factor, the record before the Court does not suggest any obvious, easy alternative to the current practice under 28 C.F.R. § 548.17, in part because the regulation does

---

[14] "[I]nmates at FCC Petersburg are required to work if they are medically able." (Moody Decl. ¶ 5.) The purpose of such a program "is to reduce inmate idleness while allowing inmates to improve or develop useful job skills, work habits, and work experience that will assist the inmates in finding employment upon release into the community." (Moody Decl. ¶ 5.)

not appear to operate inefficiently in fact, nor does this record suggest it imposes unnecessary burdens on the inmate population. The challenged regulation successfully meets all four factors in the *Turner* test.

"'[O]nce the [prison] demonstrates that it is pursuing a legitimate governmental objective, and demonstrates some minimally rational relationship between that objective and the means chosen to achieve that objective, [the Court] must approve of those means." *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 468–69 (4th Cir. 1999) (*quoting Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 358 (4th Cir. 1998)). The regulation here passes muster under this test. Accordingly, Massenburg's First Amendment claim will be DISMISSED.

Accordingly, the Court will GRANT Defendants' motions for summary judgment. The Court will DISMISS Massenburg's First Amendment claim.

An appropriate Order will accompany this Memorandum Opinion.

/s/ M. Hannah Lauck
United States Magistrate Judge

Date: 5-5-11
Richmond, Virginia